### JONES AND LAUGHLIN STEEL, INC., Plaintiff,

v.

### SCNO BARGE LINES, INC., a corporation, Defendant.

#### No. 82–0420A(C).

United States District Court,
E.D. Missouri, E.D.

Nov. 3, 1983.

Frank Gundlach, St. Louis, Mo., for plaintiff.

John S. Sandberg, St. Louis, Mo., for defendant.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

MEREDITH, District Judge.

#### FINDINGS OF FACT

1. Plaintiff Jones and Laughlin Steel, Inc. (J & L) is a steel manufacturer operating in Pennsylvania and in other states.

2. Defendant SCNO Barge Line (SCNO) is an Iowa corporation with its principal place of business in St. Louis, Missouri.

3. SCNO was the owner of Barge SCNO 7934 which was built by Nashville Barge Company in 1979. Barge 7934 is one of a series of barges built the same year. These barges are known as covered hopper barges. They are used for the transportation of steel and other commodities on the inland water ways.

4. Covered hopper barges are designed to have movable covers that can be moved out of the way for loading and then moved back into position to protect the cargo during the voyage. SCNO 7934 has eight movable covers over the cargo boxes four of the eight are low covers and four are high covers. The low and high covers alternate so that, for access to the cargo, the low covers can slide under the high covers or vice versa.

5. The covers of the barge slope toward the starboard side of the barge to permit rain to flow off the covers. Barge 7934 has a slope of seven inches from its port side to its starboard side with the port side being higher for rain to run off the covers. There are gutters at the edge of each of the covers. There is a dam in the gutter on the port side of the cargo cover.

6. On February 26, 1980, J & L delivered 111 coils of steel sheet to the river terminal at Hennepin, Illinois for delivery to Magic Chef, Inc., consignee in Chattanooga. A bill of lading, No. 66–25, was issued to cover the shipment of steel coils.

7. Marine Transit contracted with J & L to furnish personnel and equipment required for operation of the dock and the transfer of cargo to and from river vessels at the landing in Hennepin, Illinois. Marine Transit subcontracted with Tri-River Docks, Inc. to carry out the tasks of loading and unloading.

8. James Regal, the loading supervisor for J & L, testified that the steel coils loaded on Barge 7934 were not damaged at the time they were loaded on the barge.

9. Elmer Minnaert was the supervisor in charge of loading Barge 7934. He testified by deposition that the barge was in proper trim and was not listing after it was loaded. He also testified that the coils of steel were distributed evenly throughout the barge and were properly blocked so that they could not move during normal operating conditions of the barge.

10. The barge was not rejected by Wolfe Marine who moved the barge to the fleet or by SCNO who picked up the barge from the fleet.

11. The barge was picked up by SCNO in a loaded condition. It was picked up at Hennepin, Illinois by the M/V Brother Collins on March 2, 1980. The M/V Jefferson City received the barge from the M/V Brother Collins on March 3, 1980. The M/V Jefferson City took the barge to Cairo, Illinois where it was delivered into a fleet on March 9, 1980. The barge remained in Cairo, Illinois until March 12, 1980 when the M/V Imogene Igert picked it up and took it to Chattanooga, Tennessee, delivering it on March 18, 1980. The M/V Brother Collins and the M/V Jefferson City are owned and operated by SCNO. The M/V Imogene Igert is owned and operated by Igert, Inc.

12. Barge 7934 was inspected upon its arrival in Chattanooga and it was discovered that water had entered the cargo hold causing damage to sixty-seven of the steel coils. There were extremely heavy rains for approximately two weeks prior to the arrival of Barge 7934 at Chattanooga, Tennessee.

13. An inspection of the barge on arrival in Chattanooga revealed that it contained water in the cargo box and that the water had caused damage to the steel. At the forward port corner of the cargo box the water was approximately one foot deep. The forward starboard corner was under water. Water was approximately two-thirds of the way along the port side and one-third of the way along the starboard side.

14. Herman Hennessey, marine surveyor, testified by deposition that the water was pumped from the barge and thereafter Mr. Donald Brown took the draft measurements. Mr. Hennessey agreed that if the dams had not been present, the water would have rolled off the water drains onto the deck and not gone into the cargo hold. Hennessey placed the blame for the damage to the coils on improper loading of the coils into the barge which caused the weight to be unevenly distributed and the barge to list. He also stated there was no evidence that the cargo had shifted.

15. Mr. Donald Brown testified by deposition and he could not personally remember the measurements of the drafts.

16. Mr. George Vincent, fleet mate for SCNO, testified that he looked at the barge in Chattanooga and the port bow had a freeboard reading of 6′, the starboard bow of 6′10″, the port stern of 7′3″, and the port starboard of 7′10″. This would make a list to the port side of ten inches in the bow and seven inches in the stern with a difference between the starboard stern and starboard bow of one foot and the difference between the port bow and port stern of 1′3″. These measurements were observed before the water was pumped out of Barge 7934. Had such a condition existed at the time Barge 7934 was picked up in Hennepin, Illinois, it could have easily been observed by Wolfe Marine or by SCNO and

should have been rejected at that time and sent back for reloading.

17. The damaged coils were rejected by Magic Chef and later sold for salvage. After deducting all expenses, the amount of damage was $98,740.30.

18. John Colletti, plaintiff's expert, testified that the barge was unseaworthy for the reason that the drains over the cargo boxes had a dam on the port side which permitted the water to run into the hold of the vessel. If there had been no drain at all, the water would have run off of the covers on the boxes or, if no dam had been present, the water would have run out of the gutters. He further testified, based on his examination of depositions and reports, that in his opinion the coils were properly loaded and that if there was the list complained of when the barge arrived in Chattanooga, it could have been caused by the barge hitting an embankment or being in a collision.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction pursuant to 28 U.S.C. 1333.

2. The steel coils were properly delivered in good condition and properly loaded on the Barge at Hennepin, Illinois. If the list complained of by the defendant, which existed at Chattanooga, Tennessee, had been present when the barge was delivered to Marine or SCNO at Hennepin, Illinois, it should have been rejected and returned to J & L for proper loading.

3. Sixty-seven coils of steel were damaged by water in the hold of the vessel. The water entered the hold of the vessel as a result of the unseaworthiness of the vessel's construction because of the dams placed in the guttering. Defendant SCNO is responsible for the damage in the amount of $98,740.30 plus prejudgment interest at the rate of 9% from March 18, 1980, and costs.